J. W. McGUINN ET AL. v. CITY OF HIGH POINT ET AL.

(Filed 31 January, 1941.)

**1. Injunction § 14—**

The parties are concluded by decree granting a permanent injunction, affirmed on appeal, and the matters therein decided may not be relitigated, but courts of equity have the power to entertain a motion by the party restrained for a modification of the decree upon an assertion of substantial changes in the facts and situation of the parties obviating the grounds upon which the decree was based.

**2. Municipal Corporations § 10—Municipal power board held to have authority to rescind prior ultra vires resolution of city council.**

Defendant municipality, by resolution passed by its city council, proposed to construct a hydroelectric plant. Later, the council passed an amendatory resolution under which the city proposed to submit to the control of the Federal Power Commission in the operation of the plant, and pursuant thereto obtained a Federal license. Thereafter a board of power commissioners was created and authorized by statute to exercise all the powers and duties of the city with respect to the plant contemplated in the prior resolutions. *Held:* The submission by the city to the control of the Federal Power Commission being *ultra vires*, the board of power commissioners has the authority to rescind the amendatory resolution of the council in regard thereto.

**3. Same—Municipal board of power commissioners held without authority to change fundamental character of project it was created to prosecute.**

Defendant municipality, by resolution of its council, proposed to construct a hydroelectric plant and finance same by issuing bonds under the Revenue Bond Act of 1935 (ch. 473, Public Laws of 1935). Thereafter the council amended the prior resolution by resolution making substantial changes in the original plan so that the bonds contemplated would be issued under the Revenue Bond Act of 1938 (ch. 2, Public Laws, Extra Session of 1938). The General Assembly, by private act, then created a board of power commissioners for the city and gave said board all the powers and duties of the city with respect to the plant proposed by the original resolution of the council and the amendments thereto. *Held:* The board of power commissioners was created and authorized to prosecute the project as then constituted, which contemplated the issuance of bonds under the Revenue Bond Act of 1938, and the board is without power to change the fundamental character of the project by resolution rescinding the amendatory resolution of the council and reënacting the original resolution of the council, so as to bring the project within the purview of the Revenue Bond Act of 1935, and thus obviate the necessity of a certificate of convenience from the Utilities Commissioner.

**4. Same—Under provisions of statute creating it, municipal power board held without authority to affect pending litigation by changing character of project.**

Defendant municipality, by resolution of its council, as amended, proposed to construct a hydroelectric plant and finance same by issuing bonds under the Revenue Bond Act of 1938. The General Assembly, by private act,

created a board of power commissioners for the city and gave said board all the powers and duties of the city with respect to the proposed plant, and the private act expressly provided that it should not affect pending litigation. At the time of the passage of the private act this action was pending and it was determined on the former appeal that a certificate of convenience was prerequisite to the construction of the proposed plant. *Held:* Since the statute creating the board of power commissioners expressly provided that it should not affect pending litigation, *a fortiori*, the board of power commissioners created by the act is without power to affect the pending litigation by passing a resolution rescinding the amendatory resolution of the council and reënacting the original resolution of the council, seeking thus to bring the project within the purview of the Revenue Bond Act of 1935 so as to obviate the necessity for the certificate.

**5. Municipal Corporations § 5—**

Municipal corporations are creatures of the State, endowed for the public good with a portion of its sovereignty, and they must be at all times subject to its will.

**6. Municipal Corporations § 8: Utilities Commission § 2: Injunction § 14—
Certificate of convenience held necessary to construction of municipal hydroelectric plant in this case.**

The board of power commissioners of defendant municipality was created and authorized to prosecute a project for the construction of a municipal hydroelectric plant under the provisions of the Revenue Bond Act of 1938. At the time of the creation of the board of power commissioners, this action was pending in which it was judicially determined on the former appeal that a certificate of convenience from the Utilities Commissioner was a prerequisite to the construction of such plant, and the municipality was restrained from proceeding further with the project without obtaining a certificate of convenience. The board of power commissioners attempted to amend the project so as to bring it within the purview of the Revenue Bond Act of 1935, under which a certificate of convenience is not required, and the municipality made a motion for modification of the restraining order and asserted such alteration in the nature of the project as a change in conditions warranting such relief. *Held:* The board of power commissioners, being without authority to make such fundamental change in the nature of the project, its action in respect thereto is void, and the municipality has not shown a change in conditions justifying the court in modifying the permanent injunction.

**7. Municipal Corporations § 8: Utilities Commission § 2—**

The Revenue Bond Act of 1935 authorizing certain municipal projects without requiring a certificate of convenience from the Utilities Commissioner, was continued as to defendant municipality by chapters 65 and 561, Public-Local Laws of 1937. *Held:* The continuation of authority relates solely to projects within the scope of the Act of 1935, and the Public-Local Laws do not authorize the municipality to construct and finance projects beyond the scope of the Act of 1935 without obtaining a certificate of convenience.

**8. Contempt of Court § 2b—**

Where a municipality is permanently enjoined from prosecuting a particular project, and thereafter it makes fundamental changes in the char-

acter of the project to obviate the grounds of the injunction, the court, upon proper findings, correctly dismisses a rule for contempt for violation of the prior order.

**9. Equity § 1f—**

Equity follows the law.

**10. Injunction § 14—**

Upon motion for modification of a prior restraining order on the ground of change of conditions, the former decree is *res judicata* and the matters therein determined are conclusive and may not be relitigated, the sole question presented being whether movants have shown a change in conditions warranting the relief sought.

BARNHILL, J., concurring.

CLARKSON, J., concurring in part and dissenting in part.

SEAWELL, J., dissenting.

APPEAL by Adams-Millis Corporation *et al.,* plaintiffs by intervention, and Duke Power Company, intervening plaintiff, from judgment modifying restraining order and from order dismissing rule for contempt, from *Nettles, J.,* at August Civil Term, 1940, of GUILFORD.

The chronology of this case, since the former appeal, follows:

I. At the May Term, 1940, Guilford Superior Court, judgment of modification and affirmance, dated 23 May, was duly entered in conformity to the opinion of the Supreme Court rendered 17 April and reported in 217 N. C., 449.

II. On 27 May, petition to rehear the case was filed in the Supreme Court and denied 12 June.

III. Thereafter, on 15 July, 1940, the board of power commissioners of the city of High Point adopted two resolutions:

1. The first being entitled, "A Resolution Repealing a Resolution Adopted by the Council of the City of High Point on March 20, 1939, Entitled 'A Resolution Accepting License for the High Point Hydroelectric Project Issued Pursuant to Order of the Federal Power Commission on March 10, 1939.' "

The purpose of this resolution is to free the city from its agreement to abide by the conditions imposed in the license issued by the Federal Power Commission for the construction, operation and maintenance of the project. Pursuant thereto the Federal Power Commission was requested to vacate its order of 10 March, 1939, authorizing the issuance of the license, and, also, that the city be permitted to withdraw its original application therefor. Accordingly, on 25 October, 1940, the Federal Power Commission adopted a resolution vacating its order of 10 March, 1939.

2. The second being entitled, "A Resolution to Amend and Reënact a Resolution Adopted by the City Council of the City of High Point

March 20, 1939, Entitled 'A Resolution to Amend a Resolution Adopted April 27, 1938, Entitled "A Resolution Authorizing the Construction of Hydroelectric Plant and System by the City of High Point for the Use of the City and Consumers in the City, and Authorizing the Issuance of Revenue Bonds to Finance a Part of the Cost." ' "

The end sought to be accomplished by this resolution is to relieve the city from the effects of the amendatory resolution of 20 March, 1939, placing the project under the provisions of the Revenue Bond Act of 1938, ch. 2, Public Laws, Extra Session, 1938, and to declare its intention of proceeding under the original resolution of 27 April, 1938, as amended and reënacted by the resolution of 15 July, 1940, thus predicating the issuance of the proposed revenue bonds on authority of the city charter and the Revenue Bond Act of 1935, ch. 473, Public Laws 1935, and seeking to obviate the need of a certificate of convenience and necessity required by the Revenue Bond Act of 1938.

IV. At the August Term, 1940, Guilford Superior Court, with the foregoing resolutions as bases for their motion, the city of High Point and its officers, parties defendant herein, applied to the court for a modification of the judgment and restraining order previously entered in the cause.

This application was allowed, and from the judgment entered thereon the Adams-Millis Corporation et al., plaintiffs by intervention, and the Duke Power Company, intervening plaintiff, entered exceptions and gave notice of appeal.

At the same time, the court dismissed the rule for contempt—previously issued on affidavit of J. W. McGuinn, plaintiff—and based its ruling on the findings incorporated in the judgment of modification. Similar entries, as above, were noted, and appeals taken from this ruling.

*Carter Dalton and John A. Myers for Adams-Millis Corporation et al., plaintiffs by intervention, appellants.*

*R. M. Robinson, H. S. Haworth, Wm. B. McGuire, Jr., and W. S. O'B. Robinson, Jr., for Duke Power Company, intervening plaintiff, appellant.*

*Grover H. Jones and Roy L. Deal for City of High Point et al., defendants, appellees.*

STACY, C. J.  This proceeding is supplemental and summary in character.  By motion after judgment the defendants have applied for vacation or modification of the decree entered in the Superior Court of Guilford County at the April Term, 1939, enjoining the defendants from proceeding with the construction of a ¡hydroelectric power plant and system at Styer's dam site on the Yadkin River, in Yadkin County,

about 25 miles from the city of High Point. On appeal to this Court, the order of the Superior Court was modified and affirmed. Judgment on the certificate was duly entered at the May Term, 1940, Guilford Superior Court. The present motion was made at the August Term, following.

Due to the unusuality of the questions presented, the matter was thoroughly pounded and hammered at the bar. In addition, the parties have filed elaborate briefs. The restraining order heretofore entered in the cause is sought to be relaxed or obviated on account of certain changes or modifications made in the enterprise.

First. At the threshold of the hearing, the court was met with a challenge of its power to modify the judgment previously entered in the cause.

If we concede, for the moment, the authority of the board of power commissioners to adopt the resolutions of 15 July, 1940, it would seem that the court was justified in undertaking to modify the restraining order, in one particular at least, for these resolutions were intended to effect substantial changes in the enterprise. The changes sought to be accomplished were, not only from fact to fact—from interstate to intrastate commerce, but also from law to law—from Federal to State authority, and from one State statute to another. *Capps v. R. R.,* 183 N. C., 181, 111 S. E., 533. If valid, the undertaking was thus converted from one under the jurisdiction of the Federal Power Commission to one under the exclusive control of local authorities.

The parties are in sharp disagreement in respect of the authority of the board of power commissioners to adopt the resolutions of 15 July, 1940. In the court below the case was made to turn on the existence of this power. The appellants insisted then, and insist now, that no such power is vested in the board, and that without it, the resolutions are unavailing. It will be noted that the two resolutions are not alike either in kind or purpose.

We are not disposed to question the authority of the board in so far as the first resolution is concerned. Its only purpose is to rescind the prior acts of the city council in applying for, accepting and agreeing to abide by the conditions imposed in the license issued by the Federal Power Commission for the construction, operation and maintenance of the contemplated project. As these acts were *ultra vires* in the first instance, it ought not to take any great amount of power to disavow them. Having authority to act in the premises, it would seem that the first resolution was within the board's determination. Nor is the debate as to the ultimate effect of this resolution particularly germane in view of the previous holding that the city is without authority to accept the Federal license and to agree to abide by all the conditions imposed therein.

Sufficient unto the future are the problems thereof. The resolution is one of compliance and not one of circumvention.

The second resolution, however, presents a matter of different substance.

The character of the project was fixed by resolution of the council of the city of High Point on 27 April, 1938, as amended by the supplemental resolution of 20 March, 1939, which amendatory resolution brought it within the terms of the Revenue Bond Act of 1938, necessitating a certificate of convenience and necessity from the Public Utilities Commissioner.

Thereafter, on 4 April, 1939, the board of power commissioners of the city of High Point was created by Act of Assembly, ch. 600, Public-Local Laws 1939, and vested with full municipal authority over the project then established. The act provides that from and after 1 May, 1939, the city council "shall no longer exercise the powers or authority theretofore vested in them with respect to the said electric light, heat and power plant and system"; and that "all the powers and duties of the City of High Point, . . . with respect to the . . . electric light, heat and power plant and system of said city pursuant to the resolution adopted by the Council of the City of High Point on April twenty-seventh, one thousand nine hundred and thirty-eight, and amendments thereto, shall be vested in and exercised by the Board of Power Commissioners."

It will be observed that at the time of the creation of the board of power commissioners the municipality was proceeding under the Revenue Bond Act of 1938. This required a certificate of convenience and necessity from the Public Utilities Commissioner for the project in question. The purpose of the second resolution adopted by the board of power commissioners on 15 July, 1940, is to take the project from under the provisions of this act and to free it from any and all supervision on the part of the Public Utilities Commissioner. This would seem to be at variance with the grant of power which the General Assembly vested in the board of power commissioners of the city of High Point. At the time of the grant, certificate from the Public Utilities Commissioner was required and the grant is with specific reference to this requirement. The project entrusted to the board of power commissioners was the one established "pursuant to the resolution" adopted by the council of the city of High Point on 27 April, 1938, "and amendments thereto." Can the board, by later resolution, thus free itself from the supervision imposed by one of these valid amendments? The supervision attached prior to the creation of the board and subsisted at the time of its creation. It is not thought that in a matter of this kind, the law-making body intended to vest uncontrolled power in a board which is itself

beyond the reach and voice of the electorate, as is the project also. The idea of supervision may have arisen from the Federal requirement. If a Federal license when a navigable stream is involved, why not a State certificate when nonnavigable waters are touched? At any rate, it was not perceived by the General Assembly that a municipality of the State would welcome Federal domination and control and eschew all State supervision. It is axiomatic that municipal corporations, being creatures of the State, endowed for the public good with a portion of its sovereignty, must at all times remain amenable to its will.

Moreover, it is provided in the act creating the board of power commissioners, "Nor shall this act affect pending litigation." The present litigation was pending at the time of the passage of the act, and it was held on the former appeal that the city could not lawfully proceed with the undertaking without first obtaining a certificate of convenience and necessity from the Public Utilities Commissioner of the State of North Carolina. It follows, therefore, that this is still an essential requirement of the law. If the act itself is not to "affect pending litigation," what shall be said of a resolution adopted under and by virtue of the act which has as its purpose the affectation of pending litigation? The resolution appears to be one of circumvention rather than one of compliance.

In this view of the matter, it seems unnecessary to discuss the authority of the court to entertain the defendants' application for modification of the judgment. The authority may be conceded, in proper instances, upon a clear showing of changed conditions meriting relief. *Wilson v. Comrs.,* 193 N. C., 386, 137 S. E., 151; *Berrier v. Comrs.,* 186 N. C., 564, 120 S. E., 328; *United States v. Swift & Co.,* 286 U. S., 105; Annotation, 68 A. L. R., 1180. This is not to say that equity will lightly set aside its decrees, nor that matters determined on the original hearing may thus summarily be relitigated. *Lowe v. Prospect Hill Cemetery Ass'n.,* 75 Neb., 85, 106 N. W., 429. In the instant case, the matter of obtaining a certificate of convenience and necessity from the Public Utilities Commissioner was decided on the original hearing after full debate and thorough consideration. The arguments then advanced were the same as the ones now urged.

Speaking to a similar situation in *Lowe v. Prospect Hill Cemetery Ass'n., supra, Holcomb, C. J.,* delivering the opinion of the Court, said: "It is obvious that the defendants are in these subsequent proceedings concluded by the original decree as to all matters urged as a defense in that action, as well (as) any defense which might have been presented to defeat the plaintiff's demand for a permanent injunction restraining the defendants from doing the things therein prohibited. From the consequence of the decree, as to all such matters, neither of the parties can now escape. Our present consideration of the case is limited to an

inquiry as to whether, because of subsequent changes in the situation of the parties and of facts since arising creating different conditions, the defendants ought in equity to be relieved from the force and effect of a just and valid decree entered against them."

Second. From what is said above, it appears that the question of issuing revenue bonds under the city charter and the Revenue Bond Act of 1935 has been rendered largely academic. It may be added, however, that this, too, was the subject of consideration on the former appeal. Reference was then made to the discussion of the subject in the first *Williamson case,* 213 N. C., 96, 195 S. E., 90, where it was pointed out that the revenue bonds contemplated by the Act of 1935 had reference to "any undertaking, within the municipality." The same matter was again presented in the petition to rehear, which was denied.

Conceding that by amendments to the city charter, chs. 65 and 561, Public-Local Laws of 1937, the city of High Point is authorized to issue within a period of four years from 15 February, 1937, revenue bonds under the terms of the Revenue Bond Act of 1935 "for any purpose which said city is now authorized by the Municipal Finance Act or any other law to finance by the issuance of bonds," in the absence of a more definite expression, it is not thought that this would extend the provisions of the act to undertakings not originally intended to be covered by its terms, and forsooth in conflict therewith. It was said in the first *Williamson case, supra,* that in this act, "the right of acquisition, purpose of operation, and manner of financing an undertaking are linked together, and limit the extent of the undertaking." The act expired by its own limitation, and was continued for the benefit of the city of High Point for a period of four years from 15 February, 1937, and this, we apprehend, for undertakings originally within the purview of the act. *Kennerly v. Dallas,* 215 N. C., 532, 2 S. E. (2d), 538. It is provided in section 13 of the act that in case of conflict with any other general, special or local law, "the provisions of this act shall be controlling."

By the Revenue Bond Act of 1935, the municipalities of the State were authorized, for a limited time, to construct, improve and extend self-supporting undertakings, "within the municipality," and to finance them with funds derived from the sale of revenue bonds, payable solely out of the revenues of the undertaking. No certificate of convenience or necessity was required under the provisions of this act, except the approval of the Local Government Commission.

By the Revenue Bond Act of 1938, the municipalities of the State were again authorized, for a limited time, to construct, improve and extend "revenue-producing undertakings" of various kinds, including hydroelectric plants or systems, "wholly within or wholly without the municipality, or partially within and partially without the munici-

pality," and to finance them with funds derived from the sale of revenue bonds, payable solely out of the revenues of the undertaking.

Because of the extension of authority contained in this later act, it was provided that "no municipality shall construct any systems . . . useful in connection with the generation . . . of electric energy for lighting, heating and power, for public and private uses, without having first obtained a certificate of convenience and necessity from the Public Utilities Commissioner" (with exception not now pertinent).

· It was insisted on the original hearing, on the former appeal and in the petition to rehear, that by amendments to its charter the city was authorized to proceed in the premises under the terms of the Revenue Bond Act of 1935, and to issue revenue bonds, payable solely out of the revenues of the undertaking, without first obtaining the certificate of convenience and necessity required by the Revenue Bond Act of 1938. The conclusion reached was, that the certificate should first be obtained. The judgment of the Superior Court on the motion to vacate the injunction is apparently at war with the decision in this respect.

Third. On the showing made at the hearing as appears from the first resolution of 15 July, 1940, the trial court was justified in dismissing the rule for contempt under authority of what was said in the second *Williamson case,* 214 N. C., 693, 200 S. E., 388.

It results, therefore, that the defendants have not yet complied with the law as it is written in respect of the undertaking in question, if it is to be financed without resort to taxation.

It should be remembered that the city of High Point is here proceeding with a project, not in the exercise of its general municipal powers, but pursuant to special legislative authority. The legislation is new and not altogether free from ambiguity. The undertaking is likewise out of the ordinary. Liability to taxation has sought to be avoided. Difficulties have been encountered. It is agreed on all hands, however, that the defendants are authorized to proceed only as the law prescribes.

Finally, it may be useful to recall that the case is controlled by the record as presented and the law as it is written. Neither is to be ignored or disregarded. Equity still follows the law. Attention is also again directed to the fact that matters heretofore determined are not to be relitigated in this subsequent proceeding. Much of what is said in favor of a different conclusion seems to overlook this circumstance and to proceed upon the assumption that the board of power commissioners can pull itself up by its own boot straps into a field of municipal activity broader than the one established by the act of its creation—a premise not heretofore regarded as sound. *Briggs v. Raleigh,* 195 N. C., 223, 141 S. E., 597. The original decision is *res judicata* on the record as it then stood. See second *Williamson case, supra.* The question now is

whether, on account of later changes, the movants are entitled to relief from the injunction previously granted. We are not at liberty to reverse the former decision, even if regarded as erroneous, which it is not. Nor are we permitted to decide the case as legislators substituting our own notions of policy for those of the General Assembly as expressed in the statutes. *S. v. Barksdale,* 181 N. C., 621, 107 S. E., 505. To say that the defendants may avail themselves of the benefits of the several enactments and at the same time repudiate their limitations and conditions, or to hold that the Court is without jurisdiction in the premises, would be to announce a doctrine at once novel and confused. The rule has always been that granted powers are to be exercised according to the tenor of the grant, and that alleged unwarranted acts of municipal corporations are proper subjects of judicial inquiry. It is not after the manner of the courts of equity to close their doors on allegations of excessive use of power, even in the face of other available remedies. See concurring opinion in *McCormick v. Proctor,* 217 N. C., 23, 6 S. E. (2d), 870. But these matters are beside the point. They have already been concluded. Our present concern is limited to the defendants' request for a revocation of the decree on a showing of changed conditions. The showing is not sufficient.

Error and remanded.

Barnhill, J., concurring: A municipality has authority under the general law to construct and maintain its own electric light and power plant wholly within, or partly within and partly without, or wholly without, the corporate limits of the municipality. This right is not challenged either by the plaintiffs or by this Court. When, however, a city undertakes to establish and maintain such a project under special legislative authority through a board or commission which, legally, is not accountable to the citizens of the municipality, and under which authority the taxpayers are not afforded opportunity to approve or to disapprove, it must comply with the provisions of the act under which it seeks to proceed.

That the project is under the Revenue Bond Act of 1938 has already been adjudicated by this Court. Defendants do not now challenge that decision. They simply move for a modification of the former judgment upon the theory that there are changed conditions which relieve them from some of the burdens of that act.

It seems apparent to me that the Legislature, in creating the board of power commissioners of High Point, clearly limited the powers of this board. It is authorized to act pursuant to the resolution of the board of commissioners of High Point of 27 April, 1938, as amended.

This Court is bound by the intent disclosed by the language used by

3—219

the Legislature in creating the board. It "cannot attribute to the Legislature an intent which is not in any way expressed in the statute." Nor can we call a legislative requirement a mere technicality. To do so would be something new or an innovation in statutory construction.

I fully concur in the majority opinion which so clearly and succinctly points out wherein the defendants have failed to show any changed conditions which would warrant any modification of the former judgment. The act under which they are proceeding requires a certificate of convenience and necessity from the Utilities Commissioner. In this particular the defendants have failed to comply with the terms of the statute under which they are attempting to proceed.

CLARKSON, J., concurring in part and dissenting in part: *The facts:* By resolution first adopted on 30 November, 1936, the city council of the city of High Point authorized the construction and operation of a hydro-electric system. It was proposed to finance the costs of the system by grant from PWA of 45% of the costs and issuance of electric revenue bonds payable from the revenues of the system. The project was questioned in an injunction proceeding by plaintiff, the Duke Power Company, which has an electric distribution system in High Point. The city of High Point also has its own electric distribution system, which it has operated for more than thirty years. It purchases its own current for its own distribution system from the Duke Power Company. Previous opinions of the Supreme Court with regard to the city's efforts to build its own electric plant may be found in *Williamson v. High Point,* 213 N. C., 96, and 214 N. C., 693, and *McGuinn v. High Point,* 217 N. C., 449, decided 17 April, 1940. In the first Williamson opinion the Court held: (1) That bonds payable solely from revenues from such a project and not from general or tax funds of the city are not "debts" within the meaning of Art. VII, sec. 7, and Art. V, sec. 4, as amended; (2) that an electric light and power plant was a necessary expense within the meaning of Art. VII, sec. 7, of the Constitution; and (3) that under the city charter and the Revenue Bond Act of 1935, the city was not authorized to go into the "power business generally."

On the handing down of the first decision in the *Williamson case, supra,* the city council of the city of High Point changed the project, not as to location or very much as to physical characteristics, but as to purpose for which current would be used. This was done by resolution of 27 April, 1938 (this is the resolution which authorizes the present project and is now before the court for consideration). This resolution provides specifically that no distribution line or other distribution facilities shall be constructed outside of the corporate limits of the city of High Point.

The statutory authority of the resolution of 27 April, 1938, was the charter of the city of High Point, particularly Article 2-a, being chapters 65 and 561 of the Public-Local Laws of 1937, and the Revenue Bond Act of 1935. N. C. Code, 1939 (Michie), 2969 (1 to 15). When the resolution of 27 April, 1938, was adopted, the Revenue Bond Act of 13 August, 1938, had not been passed by the Legislature. The Revenue Bond Act of 1938 appears in N. C. Code, 1939 (Michie), 2969 (16 to 27).

On the adoption of the resolution of 27 April, 1938, the city of High Point and its officers were cited for contempt of court. The Superior Court held with the defendants. On appeal to the Supreme Court it was held that the lower court was correct in discharging the rule for contempt. *Williamson v. High Point,* 214 N. C., 693. On 20 March, 1939, the city council of the city of High Point adopted a resolution amending the resolution of 27 April, 1938, but made no change in the provisions of the former resolution authorizing the project, except to increase somewhat the estimated cost. The resolution of 20 March, 1939, provided for bond maturities, set out the bond form, provided for payments of electric energy furnished to the city, remedies of bondholders, etc.

The city council on 20 March, 1939, accepted a license from the Federal Power Commission under the terms of the Federal Power Act.

On 30 June, 1939, Hon. H. Hoyle Sink, Judge holding the courts of the Twelfth Judicial District, issued an order restraining the city of High Point from proceeding with the project, on a large number of grounds: (1) That the project would cost more than the funds available; (2) that the bonds would constitute a general indebtedness of the city, because the city had agreed with PWA to complete it by a set date and because the city agreed to pay for current it might use from the project for its own needs; (3) that the bonds would be issued under the 1938 Revenue Bond Act, and, therefore, the city could not proceed without obtaining the certificate of convenience and necessity provided for by that act; and (4) that the Yadkin-Pee Dee River was not navigable, and that it was *ultra vires* for the city to accept the license from the Federal Power Company.

The Supreme Court of North Carolina, on 17 April, 1940, modified the judgment of Judge Sink and held, as follows: (1) That the cost of the project was not for the Court to consider; (2) that the bonds did not constitute a general indebtedness of the city but were revenue bonds only within the principles of *Brockenbrough v. Commissioners,* 134 N. C., 1; (3) that the city was proceeding under the Revenue Bond Act of 1938, and, therefore, the certificate of convenience and necessity provided for by that act was required; and (4) that the Yadkin River in North Carolina was not navigable; that the project would have no effect on the navigable capacity of the Yadkin-Pee Dee River; that the Federal

Power Commission not being a party to the action, the Court could not pass on its jurisdiction, and that it was *ultra vires* for the city of High Point to accept the Federal Power license and to agree to comply with its terms and conditions.

In deference to the opinion of the Supreme Court and in order to remove the legal objections to the project which the Court had pointed out, the board of power commissioners of the city of High Point, on 15 July, 1940, adopted two resolutions, copies of which are attached to the motion filed in the cause. The first of these resolutions repealed the resolution of 20 March, 1939, accepting the Federal Power license, and provided that the city should no longer be bound by the terms of the license. The second resolution struck out every provision of the bond resolution of 20 March, 1939, that could possibly be construed to be predicated on the Revenue Bond Act of 1938, and reënacted that resolution so as to make it perfectly clear that the city was proceeding under its original resolution of 27 April, 1938, and the amendatory resolution of 15 July, 1940, each of which resolutions is predicated solely on the city charter and the Revenue Act of 1935.

On 17 July, 1940, the city of High Point mailed to the Federal Power Commission a copy of the resolution repealing the resolution accepting the license and under date of 18 July, 1940, the Federal Power Commission, through its secretary, acknowledged receipt thereof. Subsequently and on 17 October, 1940, the city requested that the Commission vacate its order of 10 March, 1939, authorizing the issuance of the license, and, also, that if this request be granted the city requested permission to withdraw its application. On 25 October, 1940, the Federal Power Commission adopted a resolution vacating its order of March 10, 1939 (on 25 October, 1940), which authorized the issuance of the license.

The estimated cost of the project is $6,492,600, of which $2,921,600 will be a grant from the Federal Government, PWA, and the rest from proceeds of the sale of revenue bonds. The plant will have a capacity of 21,000 kilowatts, and will deliver at High Point approximately 49,000,000 kilowatt hours per annum. The consumption of electricity in the city of High Point in the year preceding June, 1939, was approximately 44,500,000 kilowatt hours.

The court below found the facts and rendered judgment thereon for defendant city of High Point.

The judgment, on motion for modification, in the court below, is as follows:

"This cause coming on to be heard before the undersigned Judge Presiding, and holding the courts of the Twelfth Judicial District according to law, at the August 26th, 1940, Term of this Court, upon a motion in the cause by the defendants to modify the judgment entered in this

cause on June 30th, 1939, as modified by the opinion and judgment of the Supreme Court, and to modify the judgment entered in this cause at the May 1940 Term of this Court pursuant to and in conformity with the opinion and judgment of the Supreme Court, and the answer and *addendum* to the answer of Adams-Millis Corporation *et al.*, plaintiffs by intervention, and the Duke Power Company, intervening plaintiff to said motion of defendants, and upon the record and exhibits attached to said motion, and to the answer and *addendum* to answer, and resolutions of the Board of Power Commissioners of the City of High Point of July 15th, 1940, and upon the admissions of counsel for both the plaintiff and the interveners and the defendants, and from inspection of the record and the admissions of counsel, the pleadings and exhibits heretofore filed in this cause, and used by agreement of the parties herein, the Court finds the following facts:

"1. At the May, 1940, Term of the Superior Court for Guilford County a final judgment was entered in this action, which judgment permanently enjoined and restrained the defendants from constructing the proposed hydroelectric plant and system described in the pleadings filed in this action, and from any further activities, operation, development, advancement or continuation of the hydroelectric plant and system described in the pleadings filed in this action, and from any further activities, operation, development, advancement or continuation of the hydroelectric project described in said judgment.

"2. By resolution adopted April 27, 1938, a copy of which is attached to the original complaint of the plaintiff J. W. McGuinn in this action and marked 'Exhibit A,' the Council of the City of High Point authorized the construction, operation and maintenance of the hydroelectric plant and system therein described, the generating units of which are to be located at 'Styers' Ferry' on the Yadkin River in Forsyth, Davie and Yadkin Counties, North Carolina, and the distribution units of which are to be located within the corporate limits of the city of High Point, and authorized the issuance of revenue bonds to aid in financing the costs thereof.

"3. On March 20th, 1939, the Council of the City of High Point adopted a resolution entitled 'A Resolution to Amend a Resolution Adopted April 27, 1938, Entitled "A Resolution Authorizing the Construction of a Hydro-electric Plant and System by the City of High Point for the Use of the City and Consumers in the City, and authorizing the Issuance of Revenue Bonds to Finance a Part of the Cost," ' a copy of which is attached to the amended complaint of the intervening plaintiff, Duke Power Company.

"4. On March 20, 1939, the Council of the City of High Point, adopted a resolution entitled 'A Resolution Accepting License for the

High Point Hydro-electric Project Issued Pursuant to Order of the Federal Power Commission on March 10, 1939,' a copy of which is attached to the complaint of the intervening plaintiff, Duke Power Company, as 'Exhibit II.'

"5. The General Assembly of North Carolina on April 4th, 1939, adopted an Act entitled 'An Act to Amend Chapter One Hundred and Seven of the Private Laws of One Thousand Nine Hundred and Thirty-one and All Acts Amendatory Thereof Relating to the Charter of the City of High Point,' whereby all of the powers and duties of the City of High Point with respect to the establishment, acquisition, construction, improvement and operation of an electric light, heat and power plant and system of the city, pursuant to the resolution adopted by the Council of the City of High Point on April 27, 1938, was vested in the Board of Power Commissioners created by said Act. The defendants E. L. Briggs, F. Logan Porter, J. C. Siceloff, R. B. Terry and J. N. Wright are the duly qualified and acting members of said Board of Power Commissioners.

"6. Said resolution of the Board of Power Commissioners of the City of High Point, which repealed the resolution of the Council of the City of High Point of March 20, 1939, accepting the license of the Federal Power Commission, was adopted by the Board of Power Commissioners of the City of High Point in deference to the opinion of the Supreme Court of North Carolina of April 17, 1940, and with the purpose and intent of complying with the terms of said opinion, and with the judgment of the Superior Court for Guilford County entered pursuant to the opinion of the Supreme Court. The defendants City of High Point and the members of the Board of Power Commissioners now allege that the Yadkin-Pee Dee River in North Carolina is not navigable; that it is subject to the sole jurisdiction of the State of North Carolina; that the proposed hydroelectric plant and system will have no effect, either detrimental or beneficial, to the navigable capacity of the Pee Dee River in South Carolina, and will not affect the interests of interstate or foreign commerce. It is the intention of the City of High Point and of the Board of Power Commissioners of the City of High Point in good faith to construct, maintain and operate the proposed hydroelectric plant and system strictly in conformity with the laws of the State of North Carolina.

"On July 17th, 1940, E. M. Knox, City Manager of the City of High Point, sent to the Federal Power Commission at Washington, D. C., copies of the resolution of July 15th, 1940, repealing the acceptance of the Federal Power License, and, under date of July 18th, 1940, the Federal Power Commission, through its Secretary, acknowledged receipt of said communication and of the enclosed resolution.

"7. Likewise, in deference to the opinion of the Supreme Court of April 17th, 1940, in this case, and after the rendition of the judgment of the Superior Court at the May 1940 Term, pursuant to the opinion of the Supreme Court, and in order to comply with the terms of said opinion and judgment, the Board of Power Commissioners of the City of High Point on July 15th, 1940, adopted a resolution entitled 'A Resolution to Amend and Reënact a Resolution Adopted by the City Council of the City of High Point March 20, 1939, Entitled "A Resolution to Amend a Resolution Adopted April 27, 1938, Entitled 'A Resolution Authorizing the Construction of a Hydroelectric Plant and System by the City of High Point for the Use of the City and Consumers in the City, and Authorizing the Issuance of Revenue Bonds to Finance a Part of the Cost.' " ' Said resolution eliminated from the amendatory resolution of March 20, 1939, all reference to the Revenue Bond Act of 1938, and all provisions predicated upon or authorized by the Revenue Bond Act of 1938. By the adoption of said resolution of July 15th, 1940, the Board of Power Commissioners of the City of High Point has declared its intention that the proposed hydroelectric project as to authorization, construction, maintenance and operation, as to the issuance of revenue bonds to aid in the financing thereof, and in all other respects, is predicated solely upon the Charter of the City of High Point as amended, and the Revenue Bond Act of 1935. The Court's reference to the Charter of the City of High Point is intended to include Chapter 65 of the Public-Local Laws of 1937, as amended by chapter 561 of the Public-Local Laws of 1937. It is the intention of the City of High Point and the Board of Power Commissioners, as disclosed by said amendatory resolution of July 15th, 1940, that said project shall be authorized, constructed, maintained and operated, and that the revenue bonds for its financing shall be issued solely under the Charter of the City of High Point as amended by said private Acts, and the Revenue Bond Act of 1935, and without availing themselves of any of the provisions or authority of the Revenue Bond Act of 1938. The project was originally authorized by resolution of April 27th, 1938, prior to the adoption of the Revenue Bond Act of 1938, and the resolution of April 27th, 1938, was based upon authority contained in the Charter of the City of High Point and the Revenue Bond Act of 1935. By the amendatory resolution of July 15th, 1940, the City of High Point and the Board of Power Commissioners have established the fact that it is their intention to construct, maintain, operate and finance said project under authority of the City Charter as amended, and the Revenue Bond Act of 1935, as originally contemplated.

"8. At the time of the entry of the decree of the Superior Court as of June 30th, 1939, and the decree of the May 1940 Term, entered pursuant

to the opinion of the Supreme Court, the proposed hydroelectric plant and system was to be constructed, operated and maintained under the license from the Federal Power Commission, and subject to the provisions of the Federal Power Act. By resolution of April 27th, 1938, adopted prior to the acceptance of the Federal Power License, the City of High Point had authorized the construction, maintenance and operation of said project solely under the laws of the State of North Carolina. By the adoption of the resolution of July 15th, 1940, repealing the resolution accepting the Federal Power License, the City of High Point and the Board of Power Commissioners have repudiated and disclaimed the Federal Power License, and it is now their intention to construct, maintain and operate the project solely under the jurisdiction of the State of North Carolina.

"9. At the time of the entry of the judgment of June 30th, 1939, and of the judgment of the May 1940 Term, pursuant to the opinion of the Supreme Court, the City of High Point and the Board of Power Commissioners were proceeding under the Revenue Bond Act of 1938 in certain respects. The project was first authorized under the Charter of the City of High Point as amended, and the Revenue Bond Act of 1935, by resolution adopted April 27th, 1938, prior to the enactment of the Revenue Bond Act of August 13th, 1938. The provisions of the Revenue Bond Act of 1938 were resorted to only by certain provisions of the resolution of March 20th, 1939; all of said provisions have been repealed by the amendatory resolution of July 15th, 1940, above referred to. It is now the intention of the City of High Point and the Board of Power Commissioners that the project shall be constructed, maintained, operated and financed solely under the authority of the Charter of the City of High Point as amended, and the Revenue Bond Act of 1935.

"10. Since the entry of the decree at the May 1940 Term of this Court, as above set forth, substantial and fundamental changes in the facts and in the resolutions and proceedings of the City of High Point have occurred, which authorize and control the acquisition, construction, maintenance, operation and financing of the proposed hydroelectric plant and system.

"The Court, therefore, concludes as a matter of law:

"1. That the City of High Point has authorized construction, operation and maintenance of the proposed hydroelectric plant and system under its Charter as amended, and under the Revenue Bond Act of 1935, the bonds authorized to be issued for the purpose of financing a part of the costs of construction of said project to be issued under the authority of the Charter of the City of High Point as amended, and the Revenue Bond Act of 1935.

"2. The Court further finds as a conclusion of law that the City of High Point is no longer proceeding in any of these respects under the Revenue Bond Act of 1938, but has so amended and modified its proceedings as again to predicate them upon the Charter of the City of High Point as amended, and the Revenue Bond Act of 1935, which was the authority for the resolution of April 27th, 1938, and which resolution originally authorized the construction of the project and the issuance of the necessary revenue bonds.

"3. The Court further finds as a conclusion of law that the proposed bonds will not constitute a general indebtedness of the City of High Point, but will be special revenue bonds, payable solely out of the revenues of the proposed project, and are within the provisions approved by the Supreme Court of North Carolina in *Brockenbrough v. Board of Water Commissioners of Charlotte,* 134 N. C., page 1.

"4. The Court further finds as a conclusion of law that the provisions and covenants contained in the loan and grant agreement between the City of High Point and the Federal Government as of February 13th, 1939 (see record), as amended by the resolution of the Board of Power Commissioners of the City of High Point adopted November 7th, 1939, will not create a general indebtedness of the city, and said provisions and covenant likewise do not exceed the provisions approved in the decision of the Supreme Court of North Carolina in *Brockenbrough v. Board of Water Commissioners of Charlotte,* 134 N. C., page 1.

"5. The Court further finds as a conclusion of law that all the provisions and covenants of the bonds and of the resolutions of April 27th, 1938, as now amended, and all of the provisions and covenants of the loan and grant agreement of February 13th, 1939, as amended by the resolution of the Board of Power Commissioners of the City of High Point as of November 7th, 1939, are fully authorized by the Charter of the City of High Point as amended, and the Revenue Bond Act of 1935.

"6. The Court further adopts and finds as a conclusion of law that since the City of High Point is not proceeding under the Revenue Bond Act of 1938, but is proceeding under authority of its charter as amended, and the Revenue Bond Act of 1935, it may lawfully construct, operate and maintain said plant and system without a certificate of convenience and necessity from the Public Utilities Commissioner of North Carolina, and none of the limitations of the Revenue Bond Act of 1938 are applicable either to the construction or financing of the proposed project.

"7. The Court further adopts and finds as a conclusion of law that the acceptance of the Federal Power License by the City of High Point was *ultra vires,* and was so held by the Supreme Court of the State of North Carolina, and that such acceptance was not binding on the City of High Point, and that the resolution of July 15th, 1940, of the Board of Power

Commissioners of the City of High Point constitutes a rejection and disclaimer of the Federal Power License, and the Federal Power License no longer constitutes a part of the proposed project.

"8. The Court further adopts and finds as a conclusion of law that there have been substantial and controlling changes in the facts since the entry of the judgment at the May Term, 1940, of this Court, and since the opinion and judgment of the Supreme Court, which would render the enforcement of said decree with respect to the proposed hydroelectric plant and system as now designed and planned, as to construction, operation, maintenance and financing, as shown by said amended resolutions of the City of High Point, both unjust and inequitable, and the Court should, therefore, modify said decree so as no longer to restrain the defendants from proceeding with the construction, maintenance and operation of said plant and system, or the issuance and sale of its proposed electric revenue bonds.

"It is, therefore, considered, ordered, adjudged and decreed by the Court:

"That the decree entered at the May 1940 Term of Superior Court of Guilford County, pursuant to and in conformity with the opinion and judgment of the Supreme Court, as well as judgment of June 30th, 1939, shall not be deemed to restrain or prohibit and no longer shall restrain or prohibit the defendants (including the City of High Point) from proceeding with the acquisition, ownership, construction, operation, maintenance and financing of the proposed hydroelectric plant and system, or the issuance of the proposed revenue bonds to aid in financing the costs thereof, or from doing other acts reasonably necessary to carry out said purposes, within the limitations set forth below.

"It is further adjudged that this judgment is not intended to authorize, and shall not be construed to authorize, the City of High Point, its officers, agents or employees to acquire, construct, maintain or operate the proposed hydroelectric plant and system subject to the terms of the Federal Power Act, or subject to any license of the Federal Power Commission heretofore or hereafter issued, or subject to the jurisdiction or control of the Federal Power Commission.

"This the 5th day of September, 1940, This cause having been first heard at the August 5 Term of this Court and being held under advisement until this term. Zeb V. Nettles, Judge Presiding."

The policy of the State is set forth in the following statutes—N. C. Code, 1939 (Michie), sec. 2807: "The city may own and maintain its own light and waterworks system to furnish water for fire and other purposes, and light to the city and its citizens and to any person, firm or corporation desiring the same outside the corporate limits, where the service is available, and shall in no case be liable for damages for a

failure to furnish a sufficient supply of either water or light. And the governing body shall have power to acquire and hold rights of way, water rights, and other property, within and without the city limits."

Section 2832 goes into the needs of municipality, including electric lighting systems. "Any city shall have the right to acquire, establish, and operate waterworks, electric lighting systems, gas systems, schools, libraries, cemeteries, market houses, wharves, play or recreation grounds, athletic grounds, parks, abattoirs, slaughterhouses, sewer systems, garbage and sewerage disposal plants, auditoriums or places of amusement or entertainment, and armories. The city shall have the further right to make civic survey of the city, establish hospitals, clinics, or dispensaries for the poor, and dispense milk for babies; shall have the power to establish a system of public charities and benevolences for the aid of the poor and destitute of the city; for the welfare of visitors from the country and elsewhere, to establish rest rooms, public water-closets and urinals, open sales places for the sale of produce, places for hitching and caring for animals and parking automobiles; and all reasonable appropriations made for the purposes above mentioned shall be binding obligations upon the city, subject to the provisions of the constitution of the state." Public Laws 1917, ch. 136.

The municipality has the power to purchase electricity for its own use and the use of its citizens, and where it is authorized by general and special statutes to purchase current from a power company and to resell and distribute it at a profit to its citizens and to those within the three-mile zone therefrom, the grant of power to do so is effective in law under the authority of the Legislature to grant municipal corporations any powers which promote the welfare of the public and the communities in which they are established unless prohibited by the organic law. *Holmes v. Fayetteville,* 197 N. C., 740 (741).

The defendants contend: "Since the City is now clearly proceeding only under its charter and the Revenue Bond Act of 1935, no certificate of convenience and necessity is required." There are two Revenue Bond Acts in North Carolina under which the City could proceed. One is the Revenue Bond Act of 1935 and the other is the Revenue Bond Act of August, 1938. The Revenue Bond Act of 1935, by its terms, expired in 1937. However, two amendments to the Charter of the City of High Point, Chapters 65 and 561 of the Public-Local Laws of 1937, provided that the City of High Point might continue to exercise the powers conferred by the Revenue Bond Act of 1935, notwithstanding any time limitation upon the exercise of said powers contained in that Revenue Bond Act, and that the City was authorized to issue within a period of four years from February 15, 1937, revenue bonds under the 1935 Revenue Bond Act for any purpose for which the City was authorized

by any other law to issue bonds. The Revenue Bond Act of 1938 was ratified August 13, 1938. In most respects, its provisions are substantially the same as those of the Revenue Bond Act of 1935. It was necessary to enact another revenue bond act in 1938 because the old one had expired and because the State itself and many of its municipalities were anxious to obtain the benefits of PWA grants and loans. The chief difference in the two acts is contained in Section 9 of the Revenue Bond Act of 1938, which provides in effect that any municipality *proceeding under that act* should obtain a certificate of convenience and necessity from the Utilities Commissioner before constructing a gas or electric plant. Section 10 of the Revenue Bond Act of 1938 provides that: *"The powers conferred by this article shall be in addition and supplemental to, and not in substitution for; and the limitations imposed by this article shall not affect the powers conferred by any other general, special or local law."* (Italics mine.)

Section 12 of the Revenue Bond Act of 1935, C. S., 2669 (12), provides that: "It shall *not* be necessary for any municipality *proceeding under this Act* to obtain any certificate of convenience and necessity . . . from any bureau, board, commission . . ., except the approval of the Local Government Commission as required by the Local Government Act." (Italics mine.)

The record discloses that the consent of the Local Government Commission was obtained.

This project was authorized on 27 April, 1938, both as to construction and issuance of bonds under the charter of the city of High Point and the Revenue Bond Act of 1935, because the Revenue Bond Act of 1938 had not been adopted. After the adoption of the Revenue Bond Act of 1938, the city amended its bond resolution, not with respect to the authorization of the project, but only with respect to certain provisions relating to the terms of the bonds. The city has now amended the resolution of 20 March, 1939, so as to eliminate every provision that can be said to be based on the 1938 Revenue Bond Act, and so as to recite the city charter and the Revenue Bond Act of 1935 only as authority, and has reënacted the amendatory resolution of 20 March, 1939, as amended "pursuant to authority of Article 2-a of the Charter of the City of High Point."

The city is not now proceeding under the Revenue Bond Act of 1938, is not availing itself of any of the powers contained in that act; therefore, does not require the certificate of convenience and necessity, *which is necessary only for municipalities proceeding under the 1938 Act.*

As I understand the opinion on the former appeal, it only held that the city was then proceeding under the Revenue Bond Act of 1938 and therefore the certificate was required. The Court did not hold that the

city *could not proceed* under the Revenue Bond Act of 1935, and its Charter, but only that *it was proceeding* under the 1938 Revenue Bond Act. The question did not and could not arise whether the bonds *could be* issued under the Revenue Bond Act of 1935. Now, the city has amended its bond resolution so that it is in fact proceeding under the Revenue Bond Act of 1935 and the city charter. The law of the case is unchanged, but it does not apply to the present fact situation.

As I understand, the majority opinion of this Court is to the effect that defendant has followed the chart set forth in the last opinion of this Court and practically complied with its pronouncements except that the city of High Point "could not lawfully proceed with the undertaking without first obtaining a certificate of convenience and necessity from the Public Utilities Commission of the State of North Carolina."

Defendant, city of High Point, contends that under its charter and Revenue Bond Act of 1935, it is not necessary for a municipality to obtain a certificate of convenience and necessity. This contention was sustained by the court below, in which I agree.

If the city of High Point had to obtain a certificate of convenience and necessity, this must be obtained from the Utilities Commission (N. C. Code, *supra,* sec. 1037 [d]) : "No person, or corporation, their lessees, trustees or receivers shall hereafter begin the construction or operation of any public utility plant or system or acquire ownership or control of, either directly or indirectly, without first obtaining from the Utilities Commissioner a certificate that public convenience and necessity requires, or will require, such construction, acquisition, or operation: Provided, that this section shall not apply to new construction in progress at the time of the ratification of this act, nor to construction into territory contiguous to that already occupied and not receiving similar service from another utility, nor to construction in the ordinary conduct of business. *The utilities commissioner is hereby empowered to make rules governing the application for, and the issuance of such certificates* of public convenience and necessity." (Italics mine.)

This section is not applicable to an electric membership corporation, organized under the provisions of sec. 1694 (7-28). And by reason of the provisions of section 1694 (28) of the statute under which it was organized, there was no error in the holding of the lower court that the defendant electric membership corporation was not required, before beginning the construction or operation of its facilities for serving its members by furnishing them electricity for lights and power, to obtain from the Utilities Commissioner of North Carolina a certificate that public convenience and necessity requires, or will require, the construction and operation of said facilities by said defendant. *Light Co. v. Electric Membership Corp.,* 211 N. C., 717 (720). The defendants con-

tend that certificate of convenience and necessity is not applicable here. The statutes on which it relies do not so require. If it was not required, the city of High Point, in not obtaining the certificate, was not acting *ultra vires,* or beyond its powers. I do not think that the Duke Power Company, or the intervening plaintiffs, are proper parties who are permitted to raise this objection. The Utilities Commissioner represents the sovereign. N. C. Code, *supra,* sec. 446: "Every action must be prosecuted in the name of the *real party* in interest," etc. The plaintiffs are not the real parties in interest. The Duke Power Company, and the interveners, as taxpayers, under our decisions, are permitted to inquire into certain illegal conduct effecting a taxpayer. *Barbee v. Comrs. of Wake,* 210 N. C., 717.

I can find no authority for plaintiffs, Duke Power Company, or the interveners, taxpayers, to act for the sovereign State in forcing the defendant city of High Point, if it was required to do so, to obtain a certificate of convenience and necessity. Until through the sovereign, the State proceeds, this action does not present this aspect of the case for the Court's determination.

In *S. v. Scott,* 182 N. C., 865 (869), *Walker, J.,* said for the Court: "We then have a case, in the name of the State upon the relation of its Attorney-General and D. H. McCullough against the defendants, to enjoin the violation by the latter of the law creating them, wherein it is alleged that they have committed an *ultra vires* act, and to the extent that, if they pay their expenses in the doing of the alleged unlawful act, they will misapply the trust fund established by the statute for the lawful costs and expenses of the board, and thereby are diminishing the amount which should go into the public treasury by the terms of the law, which provides in C. S., 7019, that after paying expenses, 'Any surplus arising shall, at the end of each year, be deposited by the treasurer of the board with the State Treasurer to the credit of the general fund.' C. S., 1143, entitled 'Actions by the Attorney-General to prevent *ultra vires* acts by corporations,' provides: In the following cases the Attorney-General may, in the name of the State, upon his own information, or upon the complaint of a private party, bring an action against the offending parties for the purpose of—1. Restraining by injunction a corporation from assuming or exercising any franchise or transacting any business not allowed by its charter. 2. Restraining any person from exercising corporate franchises not granted, . . ." "To restrain corporations from *ultra vires* acts and which was applicable where purpose was not to dissolve a corporation, as under section 1187, but to preserve it in its functions without abuse of its powers, *Attorney-General v. R. R.,* 28 N. C., 456. This section embodies provisions of Rev. Code, ch. 26, sec. 28; Rev. Statutes, ch. 26, sec. 10; Acts of 1831, ch. 24, sec. 5, which

authorize injunction proceedings in a court of equity. The authority, given by statute, as approved by this Court, would seem to be ample justification for granting the relief prayed for by plaintiff in this action. *The Attorney-General is doing only what the statute permits him to do in the interest of the public, of his own motion, or upon the complaint of a private party."* (Italics mine.) Upon motion in the above case, the Attorney-General was made a party, which was held legal and gave the Court jurisdiction.

In *Singer & Sons v. Union Pacific Railroad Co.,* 61 Sup. Ct. Rep., 254, U. S. Law Ed., 4089 (No. 34, decided 15 December, 1940), it is held: "Under sec. 1 (18) of the Interstate Commerce Act an extension of a line of railroad may not be constructed by a railroad subject to the Act, except upon the issuance by the Interstate Commerce Commission of a certificate that the extension is required by public convenience and necessity. Under sec. 1 (20) any party in interest may maintain a suit to enjoin construction of an extension not approved by the required certificate. But a property owner, conducting a business served by a public market, which will be adversely affected by diversion of traffic and customers to a new market to be served by the allegedly illegal extension, is not a party in interest within the meaning of sec. 1 (20). . . . *The interests of merely private concerns are amply protected even though they must be channelled through the Attorney-General or the Interstate Commerce Commission or a state commission."* (Italics mine).

The question is jurisdictional. In *Rental Co. v. Justice,* 211 N. C., 54 (55), we find: "In speaking of section 55 of the Code of Civil Procedure, which was substantially the same as C. S., 446, *Ruffin, J.,* says: 'Under The Code there is no middle ground; for whenever the action can be brought in the name of the real party in interest, *it must be so done.'* *Rogers v. Gooch,* 87 N. C., 442. A real party in interest is a party who is benefited or injured by the judgment in the case. An interest which warrants making a person a party is not an interest in the action involved merely, but some interest in the subject matter of the litigation. The real party in interest in this action is the Life Insurance Company of Virginia and not its rental agent, the Choate Rental Company, and it was, therefore, error to charge the jury that under all the evidence they should answer the issue in the affirmative."

The real party in interest here is the sovereign, acting through the Attorney-General or the Utilities Commissioner.

In *Branch v. Houston,* 44 N. C., 86 (87), *Pearson, J.,* said: "The distinction is this: If there be a defect—*e.g.,* a total want of jurisdiction apparent upon the face of the proceedings, the court will, of its own motion, 'stay, quash, or dismiss' the suit. This is necessary, to prevent

the court from being forced into an act of usurpation, and compelled to give a void judgment. For if there be no plea to the jurisdiction, and the 'general issue' is not pleaded (without which there cannot be a judgment of nonsuit), unless the court can stay, quash, or dismiss the proceedings, it must, *nolens volens*, go on in an act of usurpation and give a void judgment, which is against reason. So *ex necessitate*, the court may, on plea, suggestion, motion, or *ex mero motu*, where the defect of jurisdiction is apparent, stop the proceeding. Tidd, 516, 960." *Henderson County v. Smyth*, 216 N. C., 421 (423-4).

In the previous hearing of the instant case this question was not raised, though numerous others were. Nor is this question properly raised on this record. This Court is without jurisdiction to pass upon a question not properly before it on appeal. Const. of North Carolina, Art. IV, sec. 8.

If there is any wrong done to the sovereign, the State, by the defendants' not obtaining a certificate of convenience and necessity, the Utilities Commissioner or the Attorney-General alone are empowered to inquire into the violation of the statute—if there is such. The Duke Power Company and the interveners cannot substitute themselves and do what the sovereign is required to do.

In *McCormick v. Proctor*, 217 N. C., 23, the majority opinion holds: The general rule is that courts of equity will not interfere with the enforcement of the criminal laws of the State through injunctive procedure, but will remit the person charged to setting up his defense or attacking the constitutionality of the statute in a prosecution thereunder.

The only exceptions are when it "is necessary to protect effectually property rights and to prevent irremediable injuries to the rights of person." There are no rights of person involved here and in the present case the plaintiffs have no property rights to effectually protect. The State, through its Attorney-General and Utilities Commission, are the only ones to question the failure to obtain a "certificate of convenience and necessity."

28 Amer. Jurisprudence, sec. 163, at p. 253, in part, says: "Persons or corporations seeking to restrain acts of public corporations or officials must have sufficient title or interest to enable them to maintain the suit. Suits for the protection of public rights are ordinarily brought by the Attorney-General."

In *Merrimon v. Paving Co.*, 142 N. C., 539 (549), *Connor, J.* (Henry G.), said: "Municipal corporations would find themselves embarrassed at every point of their activity, unless protected by some such restraint upon suits by the citizens. Officious intermeddlers or interested competitors could easily prevent all corporate action if, without notice to the

corporation or its governing body, courts entertained such suits." *Wheeler v. Bank,* 209 N. C., 258 (260); 124 A. L. R., p. 574 (585).

The sovereign is interested in all its citizens and corporations to see that all have equal rights and opportunities. The plaintiff, Duke Power Company, and the interveners are interested alone in their private businesses. It is for the sovereign and not them to act, if defendants' action is *ultra vires* on this phase of the controversy. North Carolina ranks first in developed water power of all Southern States and fourth in the nation. Industries and homes should have as cheap electricity as feasible, always realizing that those who have invested their money in their businesses should have and are entitled to a just and fair return on the investment. At no time should we kill the goose that lays the "golden egg." The production of power, in industries and the home, by wood fuel is a thing of the past. Coal has to be imported and we have fortunately in the State vast water power possibilities for electricity.

It is a matter of common knowledge that dozens of North Carolina municipalities own their own water and electric power plants; some in, and others outside of city limits. This power is granted by the General Assembly and therefore legal. The city of High Point has a population of 38,495. It has splendid manufacturing enterprises, including the manufacture and display of furniture, which is only excelled by one other city in the nation; and a pay roll each year of millions of dollars. The estimated cost of the project is $6,492,600, of which $2,921,600 will be a grant from the Federal Government, PWA, and the rest from proceeds of the sale of revenue bonds. The plant will have a capacity of 21,000 kilowatts, and will deliver at High Point approximately 49,000,-000 kilowatt hours per annum. The consumption of electricity in the city of High Point in the year preceding June, 1939, was approximately 44,500,000 kilowatt hours.

This is the fourth time this case has been in this Court and the litigation has been pending for years. The defendant has the legislative authority to build this project and has already invested a large sum of money in the preliminary stages. The purpose is to get a larger volume of, and cheaper, electricity for all the people of High Point. Perhaps nothing is now more important than water and electricity for a city.

In *McAllister v. Pryor,* 187 N. C., 832 (1924), speaking to the subject, it was said at pp. 835-6: "Electric appliances are becoming more in use each day. The old methods are giving way to the new. These appliances are used for ironing, cooking, washing, heating, etc. The North and South Carolina Public Utility Information Bureau states that there are now some 52 electric appliances that can be used in the home and elsewhere, such as electric ranges, bake ovens, sewing machine motors, washing machines, churns, disk stoves, dish washers, fireless cookers,

fans, grills, ironing machines, etc. Many new uses will be discovered. These appliances can be purchased at all the leading electric power stores. These appliances have been of great benefit and use, saving of time and money, to the women in the homes and in other places." Since the above decision, still newer uses have come into existence. The manufacturers of the State are now almost entirely dependent upon electricity for power; old methods are discarded. I do not question the good faith of the plaintiffs who brought this action. It is their duty as trustees to look after the interest of their properties and stockholders. May I be so bold as to say that the Duke Power Company has done a great work in North and South Carolina, through efficient officials and able attorneys, to build up the States, encourage old and new industries that have large pay rolls, and give employment to an army of bread-winners. We have a large State, with vast water power possibilities. It is of interest to home-owners, manufacturers and others to have as cheap electricity as is reasonable, but in getting this it is important not to cripple going concerns. Competition is the life of trade. The door should be open to all, as far as possible, to use this God-given power for all the people of the State. There is abundant room for everybody.

I concur in the majority opinion except in so far as it deals with the question as to who may challenge the power of the city and the question of certificate of convenience and necessity. As to these, I think the contention of defendant, city of High Point, is correct, and that the acts, under which it is operating, do not require such a certificate. Further, the plaintiffs have no authority in this injunction proceedings (equitable in its nature) to challenge High Point's power to proceed with the project. If the authority of the city of High Point to proceed is to be questioned, it is the duty of the Utilities Commissioner or the Attorney-General to raise this question. Jurisdiction cannot be granted by consent. The above public officers may conclude that there is nothing appearing on the record that requires interference if so the Utilities Commissioner may quickly grant the license so that this project may go forward—giving employment to thousands of workers and providing perhaps cheaper electricity for all of the people and going concerns of High Point. This seems to be the object and the General Assembly has granted the authority.

For the reasons given, I think the judgment of the court below should be affirmed, the injunction vacated, and the project permitted to proceed in accordance with the judgment.

SEAWELL, J., dissenting: After a candid examination of the present case and those which have preceded it (*Williamson v. High Point,* 213 N. C., 96, 195 S. E., 90; *Williamson v. High Point,* 214 N. C., 693, 200

S. E., 388; *McGuinn v. High Point,* 217 N. C., 449, and parallel cases of *Yadkin County v. High Point,* 217 N. C., 462), and of the laws, proceedings, and resolutions through which, from time to time, the defendant municipality has sought to remove any legal impediments pointed out by this Court, I am convinced that the matter has been removed from the field of substantial objection into a territory largely technical. In my judgment the questions now raised do not present any principles of law or procedure of such value that they must be preserved at all costs; none, in fact, of sufficient force to overcome the presumption in favor of the correctness of the decision in the lower court.

Counsel for the plaintiffs have not fought without a measure of success. They have been instrumental, at least, in reducing the High Point project down to universally recognized standards of municipal necessity, both territorially and in concept of purpose. They have aided in preventing the expropriation of control of a State-created municipality to Federal jurisdiction. They have removed the city of High Point as a potential competitor for business from the general public. To further reductions or restrictions, or total defeat of the project, I do not believe the interveners entitled, either in morals or in law. They now stand opposed to the city's purpose to provide electric current for its own inhabitants within its own territory, to acquire and conduct facilities for that purpose of the same character and kind that other municipalities of the State now possess and freely enjoy without question as to their powers. The objections now advanced to justify this position relate to supposed defects of procedure and not to anything inherent in the project itself which would render it *ultra vires,* or which might necessarily prove detrimental to the public or to any taxpayer as such. And from the procedural point of view, into which the controversy has now drifted, the objections are without merit.

Certainly the want of a certificate of convenience and necessity is not a technical matter, if the law should require such a thing in order to license the municipality to supply its inhabitants with a public service specifically authorized by the general laws, as well as by its own charter, and considered so necessary to decent government that the financing is not required to be referred to the electorate. *Williamson v. High Point, supra; Ellison v. Williamston,* 152 N. C., 147, 67 S. E., 255. But it would be passing strange if the law did require it. The result would be to make the city of High Point unique amongst the municipalities of the State, none other of which is subjected to such license and supervision with respect to a service rendered its own inhabitants, or the acquisition and conduct of facilities therefor. It would strike down the principle of local self-government, violate a State policy of more than 150 years standing, and would discriminate against a municipality and

the citizens thereof by withholding from them the exercise of governmental powers intended for their welfare and comfort, freely enjoyed by all other such political subdivisions of the State, without the proposed suzerainty. Any construction of pertinent statutes, either singly or in combination, which brings about such a consequence, must be supported by reasons sufficiently compelling. 59 C. J., p. 968, section 574, and cases cited. No such reasons are to be found in the record.

When the municipality was more ambitious in its designs, intending to serve the general public outside its own territory and take its proprietary profit, it was fair and just, if not within the intendment of the statute, that it could do so only upon such conditions as applied to private enterprises with which it sought to come into competition. But that is water under the bridge. The Court decided that the city had no right to engage in such an enterprise under the restrictive provisions of the 1935 Revenue Bond Act, section 3. *Williamson v. High Point,* 214 N. C., 693, 200 S. E., 388; *Holmes v. Fayetteville,* 197 N. C., 740, 150 S. E., 624. *Cessat ratio, cessat lex.*

I have never believed that the 1938 Revenue Bond Act at any time intended that a municipality availing itself of its privileges should be compelled to obtain from the Utilities Commissioner a certificate of convenience and necessity with respect to any project it might undertake under powers already conferred upon it by the general law. But that question is unimportant to the decision of the present appeal, and further consideration of it will but confuse the issue. We may as well leave this matter as it is, and pass to other ground.

The city of High Point, perforce, accepts the ruling of *McGuinn v. High Point, supra,* construing the 1938 Revenue Bond Act and striking down the exceptive provision with respect to its project. It rests its case here on the availability of the 1935 Revenue Bond Act to meet its present needs, and upon the choice which it has made, through what it regards as valid municipal action, to proceed with the financing of its electric power project through the provisions of that act. For that purpose the 1935 Revenue Bond Act is incorporated, by sufficient reference, into the city charter. Public-Local Laws of 1937, chapter 65 and chapter 561. And the High Point Power Commission, created by chapter 600, Private Laws of 1939, and succeeding to the powers of the city council with respect to this project, has, by appropriate resolution, 15 July, 1940, adopted this act as authority for its proceeding, and purposes to issue its bonds thereunder.

This the Court, in the main opinion, says cannot be done. And here, for convenience, I quote the pertinent part of the statute at which the argument of the Court is aimed:

"Sec. 2. All of the powers and duties of the City of High Point, North Carolina, with respect to the establishment, acquisition, construction, improvement and operation of an electric light, heat and power plant and system of said city pursuant to the resolution adopted by the Council of the City of High Point on April twenty-seventh, one thousand nine hundred and thirty-eight, and amendments thereto, shall be vested in and exercised by the Board of Power Commissioners, in the name of the City of High Point, and all resolutions and acts of the Council of the City of High Point prior to May first, one thousand nine hundred and thirty-nine, with respect to the said electric light, heat and power plant and system shall be deemed and considered as acts of said Board of Power Commissioners."

The obvious purpose of the reference to the resolutions as intending only to identify the project herein undertaken and to distinguish it from an electric distribution plant already existing, which, under the law, section 3, is still left under the control of the city council, is ignored.

It is held in the opinion that the phrase "pursuant to the resolution of April 27th, 1938, *and amendments thereto*," must be confined to the resolution of 27 April, 1938, and the *one amendment* made thereto—the resolution of 20 March, 1939—which latter refers to the 1938 Revenue Bond Act requiring a certificate of convenience and necessity. As we have seen, the Revenue Bond Act of 1935, to which the first resolution above mentioned referred, requires none. The opinion does not go so far as to hold that the language used in the statute is not sufficiently broad and apt to include, prospectively, all amendments which might be made under sufficient authority. Such a conclusion would be obviously specious and untenable. The conclusion is based upon an alleged want of authority in the board of power commissioners to act in the premises at all or make any further amendment.

It is clear that the restriction of the 1938 Revenue Bond Act, referring to a certificate of convenience and necessity, has no application except to a procedure under that act, and is not intended to affect powers given to municipal corporations under other laws, general or special, when no resort is had to this particular Bond Act for financing. Neither does the act creating the High Point Board of Power Commissioners mention any such condition or restriction on the powers it purports to transfer from the city council to that body. Whence, then, comes the condition or restriction which the majority opinion attaches to that power? What renders them powerless to amend or rescind the resolution of 1939 and adopt the 1935 Revenue Bond Act as authority for financing their electric power project?

The reasoning upon which the opinion in chief stops the clock at this point and freezes the situation with the 1939 resolution in force and

denies to the board of power commissioners the power to rescind or amend it rests upon a very simple speculation which is made regarding the intention of the Legislature. *It is thought that the Legislature would never have given to the board of power commissioners such uncontrolled power as the act confers without the supervision of the Utilities Commissioner, since they are not responsible to the electorate—that is, they are not elective officers.* This is further supported by the suggestion that since the Federal Government requires a license with regard to navigable streams within its jurisdiction, why is it not the policy of the State to require such license and supervision with regard to nonnavigable streams within its jurisdiction? This is remarkable, since we are not discussing the requisites of procedure under the 1938 Revenue Bond Act, but the *power* of the board of power commissioners to proceed under any act available to the municipality.

I do not think we can reach a proper construction of the act creating the board of power commissioners and conferring powers upon it as a municipal agency by piling the Pelion of surmise upon the Ossa of conjecture. "The Court cannot indulge in speculation as to the probable or possible qualifications which might have been in the mind of the Legislature." 59 C. J., p. 955; *Dean v. Bell,* 230 N. Y., 1, 128 N. E., 897; *Greer v. Kansas City C. C. & St. J. Railway Co.,* 286 Mo., 523, 228 S. W., 454. The meaning of the law must be found within its terms; *Hunt v. Eure,* 188 N. C., 716, 125 S. E., 484; *Abernethy v. Commissioners,* 169 N. C., 631, 86 S. E., 577; *State v. Leuch,* 156 Wis., 101, 144 N. W., 290; *United States v. Standard Brewery Co.,* 251 U. S., 210, 64 L. Ed., 229; and the situation to which it is to be applied. *Blair v. New Hanover County,* 187 N. C., 488, 122 S. E., 298; *Bowman v. Industrial Commission,* 289 Ill., 126. We must credit the Legislature with a knowledge of the English language and with the ability to make its meaning clear through the terms it employs in the statute. And its silence upon such an important matter is significant. The law is written primarily for the people who administer it, not for courts. For this reason, it is my thought that the Legislature would not have sent out this law, plain enough as it is for the understanding of the administrational officers for whom it is made, accompanied, so to speak, by a rider upon the winds, with a cryptic message which can only be unriddled by the astute minds of learned men.

A more practical examination of the statute thus challenged is in order, to see whether, upon such an hypothesis, it can be made to mean what it does not say.

It cannot be disputed that if the city council were still functioning with relation to this project it would still have power to pass the resolution, basing its financing on the 1935 Act, as the substituted power com-

mission has attempted to do. The spectacle of a municipality choosing the more favorable and liberal source as authority for the exercise of its powers may be disconcerting, but it is not *per se* unlawful; and this Court would not undertake to coerce the city in its choice, while acting under such plenary power, unless it intended to exhibit a bad example of government by injunction in intermeddling with the administrational affairs of the city by usurping a discretion which the law has wisely left within the exclusive province of the city authorities. It becomes a question, then, whether the statute, in substituting the board of power commissioners for the city council, succeeded, as was its apparent purpose, in securing an uninterrupted flow of power and function from the one to the other—transferring all the power which the city council itself had—which would, indeed, be adequate to take over the project in its initial stages, as it is, and carry it on to completion, making such provision for its financing as the city council itself might have done.

The statute itself, construed contextually and as a whole, leaves no doubt that it was intended to vest in the board of power commissioners all the power which the city council had with reference to the electric power project.

Returning, then, to the speculations as to legislative intent upon which the majority opinion critically hinges its conclusion, it is one of the fundamental rules of construction that "the Court cannot attribute to the Legislature an intent which is not in any way expressed in the statute." 59 C. J., p. 958, section 570, and cases noted. "The intention of the Legislature in enacting a law is the law itself." *Justice Adams* for the Court in *Hunt v. Eure, supra. Edwards v. Morton,* 92 Texas, 152, 153, 46 S. W., 792; *Cheney v. Cheney,* 110 Me., 61, 63, 85 A., 387. Speculation as to the reasons or motives of the Legislature is of little value, even when there are doubts in the statute to be cleared up. When they are indulged to the extent of imposing upon a statute drastic conditions wholly foreign to its terms, it becomes judicial legislation; *Norman v. Ausbon,* 193 N. C., 791, 793, 138 S. E., 162; *S. v. Bell,* 184 N. C., 701, 115 S. E., 190; *S. v. Barco,* 150 N. C., 792, 796, 63 S. E., 673; *Hubbard v. Dunn,* 276 Ill., 598, 115 N. E., 210; *Commonwealth v. Acker,* 308 Pa., 29, 162 A., 159; and we are forcibly reminded that it is the prerogative of the Legislature, not of this Court, to engraft limiting conditions upon the powers it confers upon a municipal agency with respect to its essential governmental duties.

Moreover, the attitude of mind attributed to the Legislature toward the High Point Board of Power Commissioners is refuted by the long established policy of the Legislature with respect to such municipal agencies. In the orderly distribution of political powers, particularly those of government, the State has not regarded the Utilities Commission

as a general board of control, or a suitable body to license or supervise either State or municipal agencies to whom has been entrusted, in no matter how small a measure, the duties of government, and some degree of the State's sovereignty. The Legislature has never required such supervision because the members of the boards, or agencies, were "not responsible to the electorate." The State went as far in that direction as it thought sound policy would permit when it created for the fiscal control of counties and municipalities the Local Government Commission, whose official approval, we find from the record, has already been sought and obtained.

Out of scores of instances I might list in which the Legislature has forgotten to place municipal agencies under the Utilities Commissioner, although the members were not "responsible to the electorate," I might mention the Morehead City Port Commission, chapter 75, Private Laws of 1933; *Webb v. Port Commission,* 205 N. C., 663; the many housing authorities constituting municipal agencies appointed under the State Housing Act, chapter 456, Public Laws of 1935; *Wells v. Housing Authority,* 213 N. C., 744; and numerous other boards of like kind now functioning throughout the State. I have yet to see a single one where that sort of supervision is required. Whether the Legislature was presumed to take cognizance of the fact that the resolution of 1939 was on the city records, I do not know. What they did know, however, because it is a rule of construction that these laws relating to the same subject are to be read together (*In re: Town of Rutland,* 128 N. Y. S., 94; *McCullough v. Scott,* 182 N. C., 865, 109 S. E., 789; *Keith v. Lockhart,* 171 N. C., 451, 88 S. E., 640; *United States v. Commissioner of Immigration of Port of New York,* 261 U. S., 611, 67 L. Ed., 826; *United States v. McCarl,* 275 U. S., 1, 72 L. Ed., 131), was that the charter of the city gave it the authority to proceed under the Revenue Bond Act of 1935, which it now desires to do, and they put nothing in the act creating the board of power commissioners which indicates a purpose to deny them that power.

To save time, I refrain from comment on the internal evidences that the act creating the board of power commissioners intended them to exercise the right to make all resolutions necessary to establish and complete the project, including appropriate resolutions as to its financing. The act makes all prior resolutions of the city council the acts of the board of power commissioners. It would be odd if they could not amend their own resolutions.

I think the assumption in the opinion in chief that the project had been established *by the resolution of 1938, as amended by the resolution of 1939,* was inadvertent. It is not supported either by the statute itself or by the condition of the project at the time the board of power com-

missioners was substituted for the city council.  It presents a concept of the condition of the project calculated to do the defendants here no little harm in the appraisal of the powers intended to be given to this agency. Also it is refuted by the wording of the act.  This refers to the project as yet to be established.  It was still, and is now, nothing more than an undertaking in its initial, unfinanced stages.  From inception to the present it has been kept so by the restraining hand of the court.  Every movement has been opposed by plaintiffs and intervening interests and every inch of progress disputed by able counsel.

In substituting a board of power commissioners for the city council as a convenient method of handling this important project, it is not to be supposed that the Legislature intended to cripple the power of the municipality in making such ordinances as might be necessary for its financing and completion by the only authority left by the Power Commission Act through which this might be done—the board of power commissioners to whom the project was entrusted.

After all, the power intended to be given the board of power commissioners by the act creating it may be measured correlatively by the power which was taken away from the city council.  After using as comprehensive language as the dictionary affords in conferring full powers on the power board, the statute provides·: "The City Council after May first, one thousand nine hundred and thirty-nine, shall no longer exercise the powers or authority theretofore vested in them with respect to said electric light, heat and power plant and system."  Where, then, did this power of the city council to deal with this important enterprise go? Under the main opinion a substantial part of it went nowhere.  It is nonexistent.

I do not know to what extent a city of many thousands of inhabitants, or any municipality, and the people within it, may be constitutionally deprived of the powers of government necessary to. their welfare by legislative action, while other cities of the State are left immune, but I do know that such a blackout of municipal power and function is not conceivably within the intention of any group qualified by intelligence to make their way into a legislative assembly.

The decision admits that there are some powers which the board of power commissioners may exercise without the supervision of the Utilities Commission, and without receiving a certificate of convenience and necessity.  One of them is, by resolution, to cancel the commitment to the Federal Power Commission and rescind the resolution accepting the license.  It is said, since that transaction was merely *ultra vires,* it did not "take much power" to rescind it.  And yet it was of sufficient substance as to justify this Court in refusing to modify its injunction so long as it lasted.  *McGuinn v. High Point, supra.*  The present plea of

the plaintiffs relates to the same sort of thing—whether the injunction shall be continued to prevent an *ultra vires* act—the further prosecution of the project without a certificate of convenience and necessity. If the want of such certificate goes to the power of the commission to act, as the opinion certainly indicates, it defeats its power to act in the one case as completely as it does in the other; if it goes only to limit municipal procedure in financing, the power of the commission to act in the one case is as valid as it is in the other, and the exercise of that power in selecting the 1935 Act as authority for financing the power project contravenes nothing which this Court has the right to maintain as an obstruction.

There is, therefore, more behind the High Point Board of Power Commissioners than a simple pull on their own bootstraps. In good faith they have attempted only to exercise a power given them by legislative enactment. The reasons assigned are not sufficient to justify us in destroying it by judicial interpretation. The functions and powers they were called into being to exercise were not new, but had existed long before this controversy began, and the grant of powers given them was not a special one, directed to a fixed situation. It was, as was the power of the city council before it, limited only by the needs of the project entrusted to them, to be exercised in as full and ample a manner as might have been done before the powers were transferred.

The position that the city of High Point is confined to "special law" for its procedure, without the aid of the general laws conferring powers on municipalities with respect to the acquisition, creation, and conduct of facilities of the kind projected, is untenable. Under the Revenue Bond Act of 1935, such powers possessed by municipalities under the general laws are recognized, mentioned, respected, and the projects to which they relate are specifically within the financing provisions of the act. The interpretation of this act as applying solely to construction of facilities wholly within the city is, therefore, upon the face of it, unwarranted. I quote for convenience: (Chapter 473, Public Laws of 1935, section 4): *"Additional powers of municipalities. In addition to the powers which it may now have, any municipality shall have power under this article:* (a) to construct, acquire by gift, purchase, or the exercise of the right of eminent domain, reconstruct, improve, better or extend any undertaking, within the municipality, and to acquire by gift, purchase, or the exercise of the right of eminent domain, lands or rights in land or water rights in connection therewith, (b) to operate and maintain any undertaking for its own use or for the use and benefit of its inhabitants and also to operate and maintain such undertaking for the use and benefit of persons, firms, and corporations (including municipal corporations and inhabitants thereof) whose residences or places

of business are (or which are) located in such municipality, (c) to issue its bonds to finance in whole or in part the cost of the acquisition, purchase, construction, reconstruction, improvement, betterment or extension of any undertaking," etc.

Under the general laws thus recognized and incorporated into the act, municipalities had power to purchase, conduct, own and lease public utilities (C. S., 2787 [3]), to acquire land or water rights, either within or without the city, to be used for water, light, or electric power (C. S., 2791), as within the projects to be financed under the provisions of the act, so long as they are used for the inhabitants of the city. The statutes cited put facilities for a water supply and for electric current on the same footing—"within or outside the city"—and I am sure it will be found few cities can find suitable water supply within the city.

The defendants are not seeking to relitigate anything heretofore decided by this Court. The question presented here is clear cut: Whether the board of power commissioners had the power to rescind the resolution of 1939 relating to procedure under the 1938 Revenue Bond Act, requiring a certificate of convenience and necessity. If they had that power, it *is* rescinded and a new situation or changed condition is presented, justifying the equitable relief prayed for. There is nothing in the case of *McGuinn v. High Point, supra,* or the second *Williamson case, supra,* that touches this question even remotely. To hold that there is anything in the second *Williamson case, supra,* so restricting the coverage of the 1935 Revenue Bond Act as to make it unavailable to the municipality for financing its project as now presented is to do violence to the express terms of the opinion. The *McGuinn case, supra,* simply held that a certificate of convenience and necessity was necessary to procedure under the 1938 Revenue Bond Act. The question of the authority of the board of power commissioners to rescind that resolution and adopt another law for its procedure could not, in the nature of things, have arisen until there was an attempt made to exercise that power, which was not until 15 July, 1940, after the opinion in the *McGuinn case, supra,* was handed down.

The plea of *res adjudicata* is strictly definitive in its nature; there is a pattern both of law and fact upon which it must be imposed. This does not appear in this record.

The conclusion reached in the main opinion that there has been no change in the condition of defendants' project is based entirely on a supposed want of power, and that, in turn, is predicated upon an attempted limitation, through statutory construction, upon the power conveyed to that body, which I regard, under the authorities cited, as arbitrary and unsupported.

McGUINN *v.* HIGH POINT.

The provision in the Power Commission Act that it shall not affect pending litigation is cited as militating against the relief sought by the defendant municipality. It is said that its purpose was the affectation of pending litigation. I do not agree with this, but I am sure it can have no such effect. It accomplishes, and was intended only to accomplish, a simple transfer of the power vested in the city council to the board of power commissioners. There is not a power added which the city council did not have, not a change attempted under its authority which the city council might not have made. The act itself does not alter the *"status quo,"* and it confers no authority, not already existing, by which this might be done.

The rights with which we are dealing are brought within the equity jurisdiction of the Court. There is no denial that the equity exists. It is true we cannot override positive law in the application of equitable principles, but when reliance is placed on the strict law—the *"strictum et summum jus"*—we are not required to follow a harsh construction which would make the law discriminatory and defeat equity, when a more consonant interpretation seems to be well within the legislative intent. It is our duty, if we can, to reconcile the two. Pomeroy, Eq. Jur., 4th Ed., sec. 427; *Riggs v. Palmer,* 115 N. Y., 506, 22 N. E., 188; *Higdon v. Dixon,* 150 U. S., 182, 37 L. Ed., 1044; 19 Am. Jur., p. 313.

The power of the court to modify or dissolve its permanent restraining orders, when changed conditions justify it, is fully established. *Emergency Hospital v. Stevens,* 146 Md., 159, 126 A., 101; *Weaver v. Mississippi & R. Boom Co.,* 30 Minn., 477, 16 N. W., 269; *Larson v. Minnesota N. W. Electric R. Co.,* 136 Minn., 423, 162 N. W., 523; *Lowe v. Prospect Hill Cemetery Assn.,* 75 Neb., 85, 106 N. W., 429 (see 75 Neb., 100, 108 N. W., 478). There is little room for doubt that the injunction, properly granted to plaintiffs for the protection of their rights as they then stood, has, through changed conditions, been controverted into an instrument of oppression, depriving the defendant of that freedom of action, or right, it ought to have, and which the law has sought to preserve to it (*United States v. Swift & Co.,* 286 U. S., 105, 76 L. Ed., 799), and should be dissolved.

Far more reliable as a guide to the interpretation of this statute is to conceive it in harmonious relation to a public policy which, it is presumed, is intended to embrace the city of High Point as well as all other municipalities of the State, and the necessity of uniformly broad municipal power and a discretion adequate to deal with its public undertakings of this character in all their phases. *Idaho Power, etc., Co. v. Bloomquist,* 26 Idaho, 222, 141 P., 1083; *State v. Kelly,* 71 Kansas, 811, 81 P., 450; *Jersey City Gaslight Co. v. Consumers Gas Co.,* 40 N. J. E., 427.

It is the policy of the State, fully established by both general and special laws pertinent to the subject, that municipalities shall have the right to acquire, create and conduct facilities for furnishing to their inhabitants electric current for power and light, if they choose to do so, rather than be dependent upon private enterprises for such current; and in doing so to resort to the few sources of hydroelectric power which have not yet been captured and exploited by private concerns. The mere existence of such a power, and its exercise where occasion warrants, has proven the best protection against exorbitant rates and inadequate service. I see no reason why such a policy should be reduced in its scope by hammering down the laws through which it is expressed below their intended level. The result is to lower the standard of municipal government to the leanest output of public service, whereas, modern thought and experience cry out for the richest. If I could bring myself to believe that the extraordinary theories advanced for putting a new meaning into the law are more reliable than what I find written between the caption and the ratifying clause, I might agree that the Legislature has signally failed to include the city of High Point in this program of emancipation.

Not only the city of High Point, but all the cities and towns in the State, depend upon the continuation of this policy for the power and freedom they suppose themselves to have. It is necessary to that conception of public policy that the statute under review be construed as transferring to this municipal board of power commissioners—as by its terms it does—all the powers which were vested in the municipality for the accomplishment of this legitimate and important public purpose. The appellants have shown no sufficient reason why the Court should acquire callouses in its hands by dragging at the skirts of progress.

Delays in the construction of this project, and particularly in its financing, must have been costly and may be fatal. If we can conceive of a race between natural forces and legal proceedings to see which may be in first at the finale, I fear the result would not be predictable. The Yadkin River runs red with the blood of Appalachian giants. The site may be silted up before the controversy is ended. But I am not willing, without a protest, that action should be taken by this Court the result of which would be simply to transfer the controversy to another forum, in which the city with respect to governmental powers and duties in serving its own inhabitants will be put upon an equal footing with a private enterprise in obtaining a certificate of convenience and necessity—a fight in which it would be more than half beaten at the beginning by the outcome of this litigation.

The judgment of the court below should be affirmed.